United States v. Stewart, and Futia v. Westchester County Court. We have with us today Judge Engelmeyer of the Southern District of New York, and we are grateful for his assistance. We'll turn to the first case, United States v. Stewart. Mr. Calhoun, I want to make sure that your colleague, Mr. Willig, is on the line. Is that correct? Yes, Your Honor. Okay. Mr. Calhoun, you may proceed. Thank you. May it please the court, and good morning. My name is Clinton Calhoun, and I represent the appellant, Corey Stewart. This appeal involves an arrest of Corey Stewart that occurred in 2015, and I guess the initial issue is whether that arrest was based on a probable cause, or whether it was based on a hunch by the arresting agents when they took Mr. Stewart into custody. Mr. Stewart's appeal also involves other consequences that he contends came into play when the agents chose to arrest him. In other words, when they chose to go that route, rather than perhaps something less dramatic, like a detention, and there's also a sentencing guidelines issue that is in the briefs. From the record, appellant contends that the agents were well short of probable cause when they arrested Mr. Stewart. The government and the district court relied greatly on the We contend that her contribution to the agents failed on just about every measure of reliability that you can think of. She had no history of being an informant, or no history of reliability with these agents. She told the agents that she had drugs and evidence of drug involvement in her apartment that turned out to be correct. It was against her penal interest. Why wouldn't that suggest that she was reliable? Well, she did own up to some of the drugs and some of the money that the agents ultimately found. There was other evidence of drug trafficking that she had not owned up to that the agents recovered in their search. But it is true that she did make some statements ultimately when she finally got around to telling the truth to the agents, which did not look pretty well established as a liar before she got to that point. She reported a white Volvo with out-of-state plates on one side and no plate on the other side, I think, in front of the car. Not too long thereafter, a car matching that description showed up at the drug depot or site. I would have to think that that form of a car might have been the only one in the whole state that bore that description. It's a relatively idiosyncratic set of descriptors for a car. Why doesn't that suggest a high degree of corroboration? Well, again, you can certainly look at it, although I should add that that was not the car that Mr. Stewart was in. And if probable cause has to be particularized to the person who was it really doesn't have anything to do with Mr. Stewart. A co-defendant, David Williams, was in that car. But Mr. Stewart was in a second car that was later arriving. Yes, but he was in a car with a woman named Amber, and she had already mentioned Amber before that. And so as soon as that turned out to be Amber, didn't they have every reason to believe that Mr. Stewart was involved, even though he wasn't in the white Volvo? No, Your Honor. There were two teams of agents who were effecting the arrest of the occupants of the Nissan Maxima. There was one team that went after Amber and the other team that went to Mr. Stewart. Under the record in my reading of it, they were not in communication with each other. So when the Amber team found out that they were dealing with Amber, that was not communicated to the Stewart team, who had already removed Stewart forcibly from the car, laid him on the ground and restrained him. So, again, it's probably... But the people who arrested Stewart, I believe, weren't they aware that Banfield had mentioned Amber previously? They would have been aware. I mean, she presumably would have spoken in their presence about the, probably about the TD bank receipt. Right. So when they learned that Amber was in the second car, they realized that they had somebody whom Banfield had mentioned that was part of the conspiracy. And therefore, wouldn't it be logical for them to think that and wouldn't they have probable cause to believe that whoever was with Amber was also part of the conspiracy? I don't think it transfers to any occupant of the car. It's not... Well, there's two things about that. If you're going to commit a crime and go pick up drug proceeds, is it logical that you bring a stranger along, somebody who knew nothing about it? That doesn't make sense, does it? Well, I don't know. It probably would not, but there's still a requirement that probable cause be particularized. And, I mean, if we were talking about Amber, I would certainly agree with your honor. But because somebody happens to be sitting in a car with Amber, he really could have been anybody. I mean, funny things happen in this world. But Banfield had also described that Skip and T and Amber were part of the group that collected the money. And all of a sudden, there are three people there, two males and a female, one of whom is Amber, who's Amber. And also there's the Volvo, which was described and so forth. The whole picture, when you take it together, indicates that the three that she was referring to, Skip, T and Amber, were there for high probability of it. I would say that if your honor were to look at the descriptions that she had given previously of Skip and T, I think your interpretation is a very charitable one. They were not described by Banfield as anything other than being African American males. I think she added to it that Skip was from New York City. So this was not exactly a narrowing or winnowing process. And she had claimed to have been in the presence of both T and Skip on previous occasions. And yet the description that she gave is almost laughably generalized. I mean, it just doesn't come anywhere close to what you would expect someone who has seen an individual, seen both of them, to come up with. She excused her inability by making an offensive remark that we noted in the brief. But I think that furthers her lack of reliability when you think that here's a person who was in their presence before and yet couldn't do any better than what she did when she was questioned by the court. I think I better save the three minutes for rebuttal. And certainly if there are any particular questions, I'm happy to take them on. Time runs so fast. All right. We'll hear from the government and then you'll have a chance to come back. Thank you. Thank you. Good morning, Your Honor. May it please the Court, I am Spencer Willig, an Assistant U.S. Attorney for the District of Vermont representing the United States. This appeal presents three sets of issues. First, the challenge to the District Court's probable cause determination regarding Mr. Stewart's arrest and release in August of 2015. Second, a set of delay claims originally brought pro se, through which Mr. Stewart attempts to apply Rule 48B, Rule 5, and the Speedy Trial Act to the period of time between his release in August of 2015 and his formal charging in this case in March of 2018. And finally, Mr. Stewart's challenge to the District Court's reading of the Career Offender Guidelines, Section 4B1.1. The District Court properly disposed of all of these issues. Its judgment and Mr. Stewart's conviction and sentence should be affirmed. That said, I plan to use my time today to address the probable cause issue unless the Court has any questions on the second two sets of issues. Turning to the probable cause analysis, there doesn't seem to be a dispute at this stage regarding the factual record developed below. The only question seems to be whether the facts, as the District Court found them, support Judge Rice's finding of probable cause. They do. As the record shows, agents had information reliable enough to be trusted. May I just cut in at the outset? You do have to establish probable cause though, do you not? In other words, the stop was justified below under Summers. But if that had been a justifiable basis for the stop, but probable cause had been lacking, the officers would not have had the right to retain the cell phone and follow any leads from it, right? Yes, Judge, that's the government's view as well. What's the basis for concluding that the two cars were together as opposed to two cars who happened to pull into the parking lot, you know, one shortly after the other? Yes, Your Honor, so the record actually has a few things on this that are worth unpacking. Judge Rice found specifically that there was reason to believe the Nissan arrived in tandem with the white Volvo. There's a couple of different angles on that arrival and on objective observations that speak to the timing. So there's the testimony of Special Agent Vilella at appendix page 276 who testified. So he was the agent who was watching the road, who was monitoring the approach to the parking lot of Ms. Banfield's apartment building. He testified that there were seconds, maybe at most minutes between the vehicles, but that in particular, by the time he saw the Volvo, recognized it as the car Ms. Banfield had identified and reached for his phone or radio to alert the search team, the Nissan was already passing him. Also noteworthy that Mr. Stewart, who testified at the suppression hearing below, conceded that when his vehicle, the Nissan in which he was riding with Amber, was pulling into the parking lot, the Volvo was still parking. I mean, that testimony is at page 313 of the appendix. I mean, of course, and then there was the link between the vehicles that was established immediately when the female passenger identified herself as Amber, linking into the rest of the information Ms. Banfield had supplied. What about appellant's counsel's claim that the two groups of agents in effect weren't communicating and therefore that the information known to one can't be aggregated with the other? Yes, your honor, a couple things on that point. I don't think the record bears out that there are two separate groups. It's a single search team that is converging on both vehicles, taking control of all the occupants of both vehicles for safety reasons, as Agent Hoffman testified. Simultaneously, in one group, the vehicles are close together. Judge Rice credited the agent testimony that there was nothing in between the two cars. They're parked next to one another. They're in a small space. To the extent that Ms. Williams-Eason's identification of herself as Amber was not immediately known to the agents on the other side of the car, it would have been known within seconds. Was her self-identification of Amber, did that predate the cuffing, if you will, of Mr. Stewart, which I take it is perhaps the benchmark here for the moment of arrest? Your honor, in our view, the record suggests that those things happened simultaneously. In particular, I believe Agent Hoffman testified at appendix page 295 that the female passenger in the Nissan gave her name as Amber within 20 seconds of the agent's approach. Those things happened either simultaneously or so close to simultaneously that they would make no difference. Your honor, returning to the probable cause analysis, just very quickly touching on an aspect of Ms. Banfield's reliability highlighted in counsel's argument. Ms. Banfield was a face-to-face informant giving information against her penal interest. She was, as counsel appropriately and correctly highlighted, a new informant, but there the district court's analysis was sound in noting that notwithstanding the fact that she was a new informant, because she was a criminal participant in the organization about which she was informing, it was appropriate under the circumstances for agents to rely on the information that she was supplying. And there the district court properly applied the Seventh Circuit's reasoning in United States versus Clark, which was also consistent with this court's reasoning in United States versus Gaviria, cited on page 20 of the government's brief. With that, unless the court has any further questions on the probable cause analysis or any of the other issues raised, the government would be prepared to rest on its brief. May I just turn for a moment to the rule 48 question? Yes, your honor. Rule 48, I take it your view is, does not in any way constrain the ability of the government to arrest and then defer pursuing an indictment to further investigate? Indeed, the arguments that Mr. Kaufman makes about why probable cause was, if present at all from his perspective, not by a lot, that would counsel in favor of giving time to investigate. What are the constraints here? What if any provisions of law from your perspective would have limited the government's range of motion or forced them to speed up? It looks like there was three years between the arrest and the indictment. What if any laws do apply to the decision to take it that slow? Yes, your honor. I think that there could be circumstances under which a arrest and release or perhaps a series of arrests and releases might conceivably trigger rule 48B. I think in this particular case, there are a couple of issues with the rule 48B argument separate from the other delay claims, in particular the standard of review. But the direct answer to that question, the best answer I think I can give is that what would activate the set of delay claims generally, what would begin to constrain the government's range of motion would be the convergence of detention and a charging document. Again, I think that the circumstances where without a charging document, there could be either prolonged detention or perhaps a series of short detentions. There's also federalism issues that are implicated in gaming state and federal parallel cases for these purposes, none of which are of course present here. But generally without the convergence of a federal charging document and detention relating to that formal charging, there would be no such constraint on the agency or the government's discretion to release someone without charges promptly. And the constitutional speedy trial command would require in effect a deliberate passage of time to allow favorable evidence to disappear, which is not concretely alleged here, right? That's our view as well, your honor. Yes. All right. Thank you. Thank you. We'll hear the rebuttal. Thank you. I just want to touch on the probable cause issue raised by the court regarding the arrival of Amber and Stuart at the, in the parking lot. Again, I submit that there's less here than meets the eye. In the record, there's up to about a two-minute gap between the arrival of the two cars, which may not sound like a lot when you just say it like that, but if you time it out on a- Well, doesn't that delay add to the probable cause because it confirms that the two cars were there together? Or if they, instead of someone getting out and going into the apartment, they sat there with their engines on in the car for two minutes, which confirms that indeed, they were there together for some inappropriate purpose. Well, they were there for some unknown purpose. I would submit is another way to look at it, but one would have thought that if the two cars were really traveling in tandem, you wouldn't see this time break that the record has in it. Again, it doesn't sound like a lot. Isn't that mitigated? Your argument really is affected by the fact that when the second car did arrive, the Nissan arrived, it pulled in right next to the first car. And then as Judge So in effect, if togetherness is the issue, they ended up being together. Doesn't that solve that problem from the government's perspective? I don't think so, Your Honor. The record seems to state that there was a gap between the two cars. In fact, they were not parked together. There was a space of, I believe the record states, at least two car widths, which that's the way it was phrased by one of the agents. But it sounds like two spaces in between. So they, in fact, I don't think it's correct to say that they pulled in next to each other. It's just human nature. When people pull into parking lots, if they see one car backed in, they'll back in too. So I don't know if any great legal conclusions could be drawn from the fact that they're parked in the same manner. It's just amorphous and not terribly informative as these two cars arrive. And by the way, the second car wasn't ever described by the informant or expected by the agent. So this was an unexpected event that was not disclosed by the informant. Thank you. In fact, if I could just suggest, I take it that the informant did not specify when they were going to arrive. It turned out that during the search, they arrived, or these two cars arrived, right? I mean, she wasn't predicting when they would come. No, she wasn't predicting. It's certainly not the car that Mr. Stewart was a passenger in. And even the white Volvo, I don't think she made any, she had mentioned the white Volvo to the agents, but did not include a prediction of when that particular car, driven by David Williams, would be arriving. I think that's the correct reading of the record. If there are any other questions of the court on any other issues, I'm do my best. Thank you very much. The court will reserve decision. Okay. Thank you.